IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ELDRIDGE EDNEY, | ) | |
| ROY HUDSON and | ) | |
| DWAYNE DALCO | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.:_____ |
| | ) | JURY TRIAL DEMANDED |
| CITY OF FORT WORTH, | ) | |
| JEFFREY HALSTEAD, individually | ) | |
| and in his official capacity of Chief | ) | |
| of Police of the Fort Worth | ) | |
| Police Department, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiffs ELDRIDGE EDNEY (Edney), ROY HUDSON (Hudson) and DWAYNE DALCO (Dalco) Collectively (Plaintiffs) files this original complaint and jury demand against Defendants CITY OF FORT WORTH ("Fort Worth"), JEFFREY HALSTEAD ("Halstead"), individually and in his official capacity of Chief of Police of the Fort Worth Police Department, alleging race discrimination, harassment, hostile work environment, and retaliation under 42 U.S.C.§1983. For cause of action, Plaintiff would show the Court as follows:

## I. PARTIES, JURISDICTION AND VENUE

1.     Edney, Hudson and Dalco are male residents and citizens of Fort Worth, Tarrant County, Texas and performed work for Fort Worth in Fort Worth, Texas during the time period giving rise to the claims in this litigation.

2.     Fort Worth is a municipality in Texas.

3.     Halstead was, and at all times relevant to this action was, the Chief of Police at the Fort Worth Police Department.

4.     This Court has jurisdiction to hear the merits of Plaintiff's claims under 28 U.S.C.  §1331 and §1343(a). The court has original jurisdiction.

5.     A substantial part of the events or omissions giving rise to Plaintiffs' claims happened within the Northern District of Texas and venue is proper in this District under 28 U.S.C. §1391.

## III. FACTUAL BACKGROUND

6.     The Fort Worth Police Department ("FWPD") hired Lt. Edney in 1985 as a Police Officer. Lt. Edney is a 29 year veteran of the FWPD. During his tenure, he has been assigned to various positions, including Patrol, Commander of Background Section of the Academy and School Unit.  After being promoted to the rank of Lieutenant in 2006, on

or about May 16, 2010 Edney was assigned as the Lieutenant over the Traffic Division Investigation Section at 1100 Nashville.   During this time, Lt. Whit Boyd was over the Traffic Enforcement Section that worked out of 5000 Martin Luther King (MLK) Freeway.

7.     Up until 2010, things were good for Lt. Edney, and he treasured every day to be working in a job that made him very happy. That changed the day that a fellow Police Officer Sergeant Delbert Johnson, who was assigned to Lieutenant Boyd in the Traffic Enforcement Section, informed Lt. Edney that he wanted Lt. Edney to see a picture. Lt. Edney went to the MLK facility and met with Sergeant Johnson. He showed Lt. Edney an offensive picture of Sgt. Ann Gates holding a noose around a snowman's neck with a police cap on his head and a banana in his hand. As African-Americans, both Lt. Edney and Sgt. Johnson were offended by the connotations that picture brought up. Sergeant Johnson advised that he had entered into his office and found the picture lying on his desk. The picture was taken outside of 5000 MLK Freeway at the Traffic Enforcement Section.

8.     Someone other than Lt. Edney complained about the inappropriate picture to Internal Affairs. After its investigation was concluded, Internal Affairs found that Sgt. Ann Gates, Sgt. D. Stamp and

Sgt. M. Cagle had violated FWPD policies and general orders. Accordingly, the FWPD issued a Commander's Admonishment to Sgt. Gates and Sgt. Cagle for this incident.

9.     After Sgt. David Stamp heard about the Commander's Admonishment that Sgt. Gates and Sgt. Cagle received, he gathered a select group of supervisors within the Traffic Division, Sgt. Gates, Sgt. Cagle, and Sgt. Tim Ellis, and told them how upset he was with Sgt. Gates' and Sgt. Cagle's admonishment, and that they should all watch out for and avoid Sgt. Johnson (the only African American supervisor assigned to the Traffic Division), who was now their enemy and could not be trusted.

10.    In the year of 2010 towards the beginning of summer Officer H. Young, who was working a "Step Grant Detail" had a motorcycle accident and went on occupational leave. While Officer Young was out on leave, his motorcycle was being secured and some officers found in his saddlebag tickets that appeared to be inaccurate. Due to those findings, a "Step Grant" investigation was conducted. At the conclusion of the investigation several officers were indicted and Lieutenant Boyd was transferred out of the Traffic Enforcement Unit on July 31, 2010. On August 1, 2010 Lt. Edney became Lieutenant over all of the Traffic Division.

11.     During this time a new Standard Operation Procedure (SOP) was created for the "Step Grant" to streamline rules and regulations. Captain B. Sudan and Lt. Edney both felt that Sergeant Johnson would be the best person to supervise the "Step Grant" due to his ability to pay attention to detail and strong record keeping skills. Sergeant Johnson had been audited by SIU and TXDOT and our own Grants Division and all have commented that he is doing an excellent job.

12.     In January 2011, Sergeant Thome came into Lt. Edney's office asking for assistance with an argument he was having with Sergeant Stamp that was getting out of control. Lt. Edney went with Sergeant Thome to meet with Sergeant Stamp. Lt. Edney advised both Sergeants that he wanted to see them in his office. Once in his office Lt. Edney gave both sergeants a verbal Coach and Counseling Session. At the conclusion of the meeting both sergeants agreed to get along with one another. Captain Sudan was also informed of the situation and advised both sergeants that if the conflict continued someone would be transferred.

13.     In the summer of 2012, Lt. Edney developed a New Traffic Mission to help free up patrol. This mission stated that traffic officers would begin to help with all traffic accidents, allowing patrol to answer

more non-accident related calls.   In October, Lt. Edney noticed that Sergeant Stamp's motor team's accident production was unsatisfactory. As a result, on October 22, 2012 Lt. Edney met with Sergeant Stamp and informed him that his team needed to increase their accident production and support the New Mission.   In December, Lt. Edney noticed that Sergeant Stamp's motor team accident production was still unsatisfactory. Lt. Edney gave Sergeant Stamp a written one-on-one counseling session. In that meeting Sergeant Stamp stated, "You need to tell the Major Gene Jones he needs to pick his battles carefully" and then walked out of Lt. Edney's office.

14.   In January 2013, Lt. Edney came to work that morning and Sergeant Delbert Johnson asked Lt. Edney to join him and Officer Karl K. Hodge in the Nashville parking lot. Officer K. Hodge advised that Sergeant Stamp sent an anonymous complaint to the Special Investigation Unit (SIU) on Sergeant D. Johnson claiming that he was stealing from and abusing the "Step Grant."   Although the letter was sent from an anonymous person, just three days later, Sgt. Stamp told investigators in the Special Investigation Unit (SIU) that he had sent it and that he would help in any way possible in their investigation of Sgt. Johnson.

15.     Around January 28, 2013 Sergeant Johnson gave Lt. Edney a Hostile Working Environment Complaint against Sergeant Stamp. Lt. Edney showed the complaint to Captain Sudan, and on January 29th, 2013 Lt. Edney turned the complaint into Internal Affairs Division.  In February there was a lot of talk amongst the Traffic Division Officers about a "secret meeting" that had occurred between Sergeant Stamp, Sergeant Gates, Sergeant Cagle (two of them are board members for the Police Officer Association) along with Chief Halstead. The meeting was to complain about Major Gene Jones and Lt. Edney. Lt. Edney later discovered that the meeting actually did occur and the new Captain, Martin Salinas, was also involved in the meeting.

16.     In March 2013, Captain M. Salinas, who became the Traffic Captain on March 9, 2013, advised Lt. Edney that he wanted to have a meeting with the supervisors over traffic, but did not want Lt. Edney to attend. Lt. Edney was not provided with a reason for why Cpt. Salinas did not want Lt. Edney there.  After the meeting Sergeant Thome came to Lt. Edney very upset. Sergeant Thome advised that Captain Salinas was very belittling and negative towards Lt. Edney. Sergeant Thome indicated that he was so upset and was going to request a meeting with Chief Halstead.

17.    There were a lot rumors around the Traffic Division that the three sergeants complained that Lt. Edney was going to lunch with Major Jones as well as other unfounded negative untruthful things that were damaging the reputation of Lt. Edney.    These negative rumors steamed from the "secret meeting" that took place between Sergeant Stamp, Sergeant Gates, Sergeant Cagle and Chief Halstead.    The dishonest information was being said so that action could be taken against Lt. Edney and Deputy Chief Jones.

18.    Lt. Edney decided to talk to Captain Salinas about one month after he became Captain over traffic, and Captain Salinas advised that he was upset with Lt. Edney because Lt. Edney sent an email to Deputy Chief Jones and only cc'd him.  Lt. Edney then reminded Captain Salinas that Lt. Edney was acting Captain during that time the email was sent, and only cc'd him to keep him abreast on what was going on in his division. Captain Salinas then informed Lt. Edney that Chief Halstead placed him over traffic to evaluate Lt. Edney and other people so he could determine the problem and transfer those that needed to be transferred.

19.    On June 27, 2013, while Lt. Edney was out of town on vacation, he received a phone call from Sergeant Delbert Johnson advising

him that he had a meeting with Chief Halstead and during this meeting Chief advised him that Lt. Edney had failed him as a supervisor, and everything that was happening to Sergeant Johnson was Lt. Edney's fault. Sergeant Johnson advised the Chief that Lt. Edney did not fail him, but Captain Sudan did.  Chief Halstead stated that he was going to transfer Lt. Edney immediately out of the Traffic Division. Sergeant Johnson told the Chief that if he did that he would be doing a grave injustice to Lt. Edney and the Traffic Division. The Chief later recanted his statement and said not to tell Lt. Edney anything about the transfer because he may do something different.  However, towards the end of Lt. Edney's vacation he was notified by Sergeant Johnson that Captain Salinas was interviewing Lieutenants for Lt. Edney's position.  At that point, Lt. Edney had still not been made aware by any of his commanders of a transfer.

20.     Lt. Edney called Sergeant Gutter, administrative assistant, to Assistant Chief Pridgen to schedule a meeting.   Lt. Edney met with Assistant Chief Pridgen on July 10, 2013. During this meeting Lt. Edney advised Chief Pridgen that he heard rumors that he was being transferred and wanted to know if the rumors were true. Chief Pridgen advised Lt. Edney that Captain Salinas wanted him transferred. When asked what he had done to be transferred, Chief Pridgen stated that Lt. Edney had not

been keeping documentation on Sergeant Stamp.  Lt. Edney asked if he was referencing to the anonymous letter that Sergeant Stamp sent straight to SIU because there was no way that any of the command staff knew about that letter. In fact, the only way Lt. Edney found out about that situation was the morning he pulled into the Nashville sector and was approached by Officer K. Hodge and Sergeant D. Johnson. Chief Pridgen also stated that Lt. Edney failed to document an email that was sent to Captain Salinas from Sergeant Stamp where Sergeant Stamp said, "No" to a request that was made by Captain Salinas. Lt. Edney then advised Chief Pridgen that Captain Salinas had forwarded the email to Captain Sudan, and Captain Sudan informed Lt. Edney that he would handle it "Captain to Captain." Moreover, this incident had occurred more than two years ago.

21.    Lt. Edney became upset because he has been with the Fort Worth Police Department for twenty eight years and had received distinguished evaluations since he had been in Traffic. Lt. Edney was also nominated for Commander of the year by Captain Sudan in 2011 and 2012. Even though Lt. Edney requested, he received no documentation from Captain Salinas regarding why he was being transferred.  Without the proper documentation, you cannot transfer a Lieutenant.

22.     on July 18, 2013, Lt. Edney met with Captain Salinas, Deputy Chief Jones, Assistant Chief Pridgen and Sergeant Gutter who sat as a witness inside of a conference room at 350 W. Belknap.  Assistant Chief Pridgen opened up the meeting by stating that Captain Salinas would advise why he wanted Lt. Edney transferred.  Captain Salinas said he wanted a Lieutenant that would be loyal to him, and Lt. Edney was not loyal to anyone but Deputy Chief Jones. This statement; however, was untrue as Captain Salinas and Lt. Edney have been friends for more than 27 years.  Captain Salinas also stated that he wanted to be able to pick his own Lieutenant, because he wanted to go in a different direction. During our meeting Captain Salinas advised that the talk about transferring Lt. Edney came about after an All Staff Meeting that occurred on or around June 27, 2013. Chief Halstead met with Captain Salinas and Assistant Chief Pridgen advising them that he wanted Lt. Edney transferred out of the unit.  In addition, Chief Halstead advised Captain Salinas that he could start looking for a new lieutenant as soon as possible.

23.     However, on July 15, 2013 after requesting to meet with the Chief Halstead, he advised Lt. Edney via email of the following:

> "There is a lot of miscommunication about your pending transfer or discussions regarding this decision. Please understand this decision is a Captain's decision and not

> ordered by me. I made it very clear to Assistant Chief Pridgen that decisions like this stay at the lower levels in the chain of command and will not be decided at my level." -Chief Halstead

Captain Salinas advised that he interviewed three lieutenants for Lt. Edney's position while Lt. Edney was on vacation. Lt. Edney stated to Captain Salinas that this was very unprofessional, disrespectful, and unfair to do that to Lt. Edney without any warning or write-ups.

24.     Lieutenant Hawkins was one of the Lieutenants Captain Salinas interviewed. On July 11, 2013 Lieutenant Hawkins came into Lt. Edney's office at the Traffic Division and advised Lt. Edney that during her interview with Captain Salinas he was saying negative things about Lt. Edney. She stated that he blamed Lt. Edney for the lack of documentation on the "Snowman" incident and advised her that the last straw for him making the decision to get Lt. Edney out of the unit was because Lt. Edney did not attend Sergeant A. Gates retirement party which is not a General Order violation.

25.     As a result of the false accusations and discriminatory behavior, Lt. Edney filed a complaint with FWPD's HR Department in July 2013, alleging a pattern and practice of pervasive race discrimination, harassment, hostile work environment.

26.    Chief Halstead discriminated and retaliated against Lt. Edney when he transferred him out of the Traffic Division to Patrol. This transfer changed Lt. Edney's work schedule from day shift 9:00 a.m. to 5:00 p.m. Monday through Friday to the 5:00 a.m. to 3:00 p.m. shift and while before the transfer, Lt. Edney didn't work weekends or holidays, he was now required to work every weekend and every holiday.   In addition, Lt. Edney's take home vehicle was taken away. This was a punch to Lt. Edney's gut, completely changing the quality of his and his family's personal lives and likewise severely impacting the amount of compensation he was making because he no longer got overtime hours that he had been receiving when he was in Traffic. Additionally, the transfer and shift change resulted in the loss of a part-time secondary job that he held, costing Lt. Edney thousands of dollars in lost income. All told, the amount Lt. Edney lost in income was over $30,000.00.

27.    The Fort Worth Police Department ("FWPD") hired Sgt. Hudson in 1996 as a Police Officer. Sgt. Hudson is an 18 year veteran of the FWPD. During his tenure, he has been assigned to various positions, including Patrol Officer, Neighborhood Patrol Officer, Narcotics Special Operations Division, and Detective. Hudson was assigned as the Sergeant over South Division and is currently the Sergeant for the South Division

Neighborhood Patrol Officers.

28.     The Fort Worth Police Department ("FWPD") hired Sgt. Dalco in 1987 as a Police Officer. Sgt. Dalco is a 27 year veteran of the FWPD. During his tenure, he has been assigned to various positions, including Patrol Officer, Community Liaison Officer, Vice, Weed and Seed, Field Training Officer, Internal Affairs, Recruit Training Sergeant and Detective. Sgt. Dalco was assigned as the Sergeant over the Recruitment Unit.

29.     In February 2013, Sgt. Hudson was the vice-president of the Fort Worth Black Law Enforcement Officers Association (FWBLEOA) and Sgt. Dalco was the President. Sgt. Dalco and Sgt. Hudson met with assistant city manager Charles Daniels to re-establish and strengthen the organization's relationship with the City.   Past presidents of the organization and executive officers have had an open invitation to meet with the mayor, city managers, and city council members to discuss matters affecting the organization.

30.     Days after the meeting with Mr. Daniels, Sgt. Dalco and Sgt. Hudson were requested to report to Internal Affairs (IA) and were questioned about the details of the conversation with assistant city manager

Daniels. Sgt. Hudson was asked to hand over his  personal cell phone to IA for the collection of additional data to determine if "Meet and Confer" violations had occurred. This was requested even though no personnel had filed a complaint and Sgt. Dalco and Sgt. Hudson were both interrogated. Subsequently, Fort Worth police chief Halstead was informed by IA that no "Meet and Confer" violations had occurred.  In spite of this knowledge, Chief Halstead order another white police officer to file a complaint with IA so that he could continue the IA investigation based on "ill will" because Sgt. Dalco and Sgt. Hudson were African-Americans. Chief Halstead has a history of discrimination in the department as it relates to disparate treatment of African-American officers or transferring them at will.

31.    This incident caused Sgt. Dalco and Sgt. Hudson to file a racial discrimination grievance against Chief Halstead as an Internal Affairs investigation is not the proper mechanism to grieve allegations of "Meet and Confer" violations and for discrimination.  However, the City failed to address the grievance filed by Sgt. Dalco and Sgt. Hudson within the allotted time frame and as a result the City violated city policy by failing to address the grievance in a timely manner. The Fort Worth Police Officers Association as well as the FWBLEOA sent a letter to the city

manager stating the "Meet and Confer" contract is between the Fort Worth Police Officers Association and the City Manager. There were no violations of the contract by Sgt. Dalco and Sgt. Hudson because FWBLEOA actions are not governed or controlled by the contract with the Fort Worth Police Officers Association and the city. Only the actions of the city management are controlled by the contract. Sgt. Dalco and Sgt. Hudson had done absolutely nothing wrong and should not have been investigated by IA. The investigation was conducted solely because of Sgt. Dalco and Sgt. Hudson's race.

32. At this point, the discriminatory and retaliatory actions of the FWPD were so out of control that the leaders of the Fort Worth Black Police Officers Association filed complaints alleging race-based discriminatory and retaliatory treatment and harassment by supervisory and senior level officers within the Department. Since the continuing pattern of harassment, discrimination, and retaliation continued unabated, both Sgt. Johnson and Lt. Edney filed complaints with the Mayor and City Manager. Because all these grievances and complaints of discrimination had gone unaddressed within a timely manner, the City retained Coleman & Associates to perform an independent investigation of all of these complaints, including Lt. Edney's Sgt. Hudson's and Sgt. Dalco's.

33.     The Coleman Report (Coleman) came out late last year. After a thorough investigation, Coleman found that the FWPD had tolerated and allowed a hostile work environment over a three year time period that was based in part on race and retaliation for Lt. Edney's, Sgt Hudson's and Sgt. Dalco's prior complaints of race discrimination and harassment. This was a highly publicized report that generated many news reports. It also resulted in the extraordinary measure of Chief Halstead publicly apologizing for the racial and retaliatory animus that was so pervasive within the Department. In the video that was posted on YouTube, Chief Halstead admitted that Sgt. Johnson and Lt. Edney specifically and others generally were discriminated against because of the color of their skin.

34.     It was furthered discovered through the Coleman Report that Chief Halstead order a white police officer to file a complaint with IA that Sgt. Dalso and Sgt. Hudson violated the "Meet and Confer" order, even though there was no supporting documentation or validity to the fact that the meeting that Sgt. Dalco and Sgt. Hudson attended with the assistant city manager was in violation of the "Meet and Confer" contract. Moreover, Chief Halstead had already been made aware by IA that there was in fact no violation of the "Meet and Confer" contract.  Chief Halstead ordered this IA investigation because Sgt. Dalco and Sgt. Hudson were

African American.

35.    Because of the complaints made against Chief Halstead by Dalco and Hudson, Chief Halstead began to retaliate against Sgt. Dalco and Sgt. Hudson by having meetings with non-African American Officers and began to create a hostile work environmental against Sgt. Dalco and Sgt. Hudson.

36.    As a further result of the Coleman Report, Lt. Edney was transferred from Patrol to the School Security Initiative Section in August of 2014. While Lt. Edney would have rather been back in the Traffic Division, his reputation had been sullied and the atmosphere had been so poisoned with all the lies and discrimination that going back to the section after all that had transpired would have been difficult to endure.

37.    The almost four years of continuing race discrimination, harassment, and retaliation has taken a severe emotional toll on Lt. Edney and his family. The emotional distress and mental anguish he has suffered is significant to say the least.

38.    Because of the continuing race discrimination, harassment, and retaliation it has taken a severe emotional toll on Sgt. Hudson and his family.  Sgt. Hudson has lost countless hours of sleep and has lost a lot of

weight while enduring this discrimination. Sgt. Hudson became the subject of personal attacks and insults. As a result of Chief Halstead's failure to publically disclose his misuse of internal affairs to investigate Sgt. Hudson, very distinct racial lines were drawn within the department. Sgt. Hudson has received numerous threats, insults and personal attacks based on the actions of Chief Halstead. Every day that Sgt. Hudson has to come to work he's looking over his shoulder and wondering what is going to happen to him each day. Sgt. Hudson has been personally attacked in person as well as on law enforcement social media pages. Sgt. Hudson is afraid for not only himself but also his family. Sgt. Hudson has lost 28 pounds throughout this ordeal with the Chief Halstead, and has recently been clinically diagnosed with major depression, anxiety and ulcerative colitis. Chief Hallstead created a racially hostile work environment. Sgt. Hudson was also retaliated against for standing up for his rights and the rights of other minority officers within the department.

39.    Because of the continuing race discrimination, harassment, and retaliation it has taken a severe emotional toll on Sgt. Dalco. Sgt. Dalco has been humiliated by Chief Halstead and has been made to endure racial comments. Sgt. Dalco's ability to supervise has been affected as he

has been labeled and trouble maker and has suffered through a hostile work environment.

## I. CAUSE OF ACTION: SECTION 1983 – RACE DISCRIMINATION, HARASSMENT, HOSTILE WORK ENVIRONMENT, AND RETALIATION

40.     Plaintiffs re-allege and incorporate the allegations in paragraphs 1-39 as if fully stated herein.

41.     All conditions precedent to the filing of this action has occurred or has been fulfilled.

42.     Plaintiffs were employees of Fort Worth.

43.     Defendants willfully discriminated, harassed, created and tolerated a hostile work environment, and retaliated against Plaintiffs as described above.

44.     As a result of the unlawful discriminatory and retaliatory actions of Defendants as described above, Defendants have violated the provisions of Section 1983 in that acting under color of law, they, jointly and/or severally, deprived Plaintiffs of his rights, privileges, and/or immunities as provided by the Constitution of United States and its Laws.

45.    Defendants acted with intent to violate or with reckless indifference to Plaintiffs' clearly established rights under the First and Fourteenth Amendments.

46.    Plaintiffs have suffered, and will continue to suffer, actual damages, compensatory damages, emotional distress, loss of reputation, and humiliation, for which he hereby seeks to recover.

47.    Defendants' conduct constitutes a willful violation of Section 1983, entitling Plaintiffs to recover punitive damages.

48.    Plaintiffs also seek attorneys' fees, reasonable expert witness fees, and costs of the action.

## VI. JURY DEMAND

49.    Plaintiffs hereby demand a jury trial on all issues, claims, actions, and defenses in this case.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that Defendants be summoned to appear and answer, and that on final trial, judgment be granted against Defendants, jointly and severally, awarding Plaintiffs the following:

a.   Actual damages;

b.   Compensatory damages, including damages for emotional distress, loss of reputation, and humiliation;

c.   Punitive damages;

d.   Injunctive relief enjoining Defendants from engaging in unlawful practices in violation of Section 1983;

e.   Prejudgment and post-judgment interest, in the maximum amount allowed by law;

f.    Attorneys' fees, expert fees, and costs of suit; and

g.    Such other and further legal and equitable relief to which Plaintiff may be justly entitled.

Dated: January 12, 2015

Respectfully submitted,

By: /s/ Ray Jackson
**RAY JACKSON**
THE JACKSON LAW FIRM
SBN 00797754
3838 Oak lawn Ave., Ste1350
Dallas, TX 75219
214.651.6250 (Office)
214.651.6244 (Facsimile)
rjackson@jacksonfirm.net

**ATTORNEYS FOR PLAINTIFFS**